In re CRAMER & ROGERS GROCERY CO.  G. H. HAMMOND CO. v.
DANENHOWER.  SWIFT & CO. v. SAME.

(Circuit Court of Appeals, Third Circuit.  July 12, 1918.)

Nos. 2357, 2358.

BANKRUPTCY  ⬡⟞166(5)—PREFERENCES—KNOWLEDGE OF CREDITOR.

Receipt by an agent of payment of the claims of two creditors of bank-
rupt, a grocery company, then actually insolvent, after notification by
its attorney that it was in difficulties and that a statement to him by its
president was probably untrue, and on the express condition that he
surrender the statement, held sufficient to sustain a verdict finding the
payments preferential.

In Error to the District Court of the United States for the District of
New Jersey; J. Warren Davis, Judge.

Actions at law by John C. Danenhower, trustee in bankruptcy of
the Cramer & Rogers Grocery Company, against the G. H. Hammond
Company and against Swift & Co.  Judgments for plaintiff, and de-
fendants bring error.  Affirmed.

Walter H. Bacon, of Bridgeton, N. J., for plaintiffs in error.

Wilson & Carr and Walter R. Carroll, all of Camden, N. J., for
defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Cir-
cuit Judges.

McPHERSON, Circuit Judge.  In these two actions the trustee
sued to recover preferential payments.  They were tried together, and
in each the important question was, and still is, whether the evidence
was sufficient to go to the jury.  The disputed payments were made
to J. H. Loomis, the agent and credit man of each defendant, and
the precise question, now and at the trial, is whether the trustee had
satisfactorily proved that when Loomis received the money he had
reasonable cause to believe that the payment was intended to prefer.
On this point the record contains sufficient evidence of the following
facts:

The petition in bankruptcy was filed August 21, 1914, and the pay-
ments were made on August 5—the Grocery Company being then in-
solvent—one payment of nearly $1,200 to the Hammond Company
and one of about $2,700 to Swift & Co.  If on August 5 Loomis had
reasonable cause to believe that the bankrupt was insolvent, every
other element of a preference is present.  This is not the usual situa-
tion, where an account has been long overdue and a creditor's fears
and suspicions have gradually become acute.  On the contrary, the es-
sential knowledge that Loomis had, and by which he is to be judged,
came to him during two days, August 4 and 5, and in the nature of
things it would be more impressive because it was unexpected.  He
knew that the Grocery Company was the owner of 12 stores in
New Jersey, and was apparently doing a prosperous business of several
thousand dollars a week.  For some months, at least, his principals had

⬡⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

been dealing with the company on the basis of weekly credit, and their bills had been satisfactorily met. The record does not show the items of charge and credit during the period of mutual dealings, but it does show that the oldest item of charge on the Hammond account was July 17, and on the Swift account July 14. How much was overdue on each account does not appear, but in any event the amounts overdue on August 4 were not of long standing, and there is nothing to suggest that either defendant felt any anxiety about payment. Moreover, since July 21 Loomis had in his possession a financial statement made by the bankrupt's president, which showed the company to be solvent by a margin of more than $50,000. Naturally he felt no uneasiness, and it does not appear that he had even a suspicion that the accounts might be in danger. But on August 4 he received a visit at his office in Philadelphia from an attorney who had close relations with the management of the company, and was told that the company's real condition was such that it could not go on unless its creditors would agree to some arrangement—the reason being that ready money was imperative and could not be had either from the stockholders or from any other source. The defendants' claims were among the largest, and the attorney asked to have them put into his hands; his object being to get control over the situation that was likely to develop. At this unexpected turn of events Loomis produced the statement of July 21, and made it plain to his informant that if the statement was untrue the president might have to face a criminal prosecution. The attorney examined the statement and expressed doubt of its accuracy. Thereupon the claims were put into his hands for immediate collection, and he took them back to New Jersey, where he laid the matter at once before his office associate, who was also the company's attorney and secretary, and by one or both of them the subject was brought to the president's attention. The next day, August 5, the president himself and the two attorneys withdrew from the banks in which the company kept its deposits enough money to pay the two claims and brought the cash to Philadelphia. The reason for taking this unusual step, instead of sending a check to Loomis, or making payment to the attorney in New Jersey, sufficiently appears; they intended to offer the money to Loomis, and they did offer it, on the express condition that the statement should be surrendered, and the payment was not made until the condition was agreed to. Soon afterward the statement was destroyed.

Now, it is fair to say that all this was unusual, and could not be disregarded, as if it were a matter in ordinary course. Clearly it gave Loomis notice that the statement on which he was relying was probably untrue; for, if true, the company could easily pay its debts in the customary way, and the existence of the statement would be of no importance. To demand its surrender as the condition of payment looked much like an admission of its falsity, and of fear that it might be used to support a criminal prosecution. Still further, and of much significance, it was also proved that, while the discussion was proceeding on August 5, the attention of Loomis was expressly called to the

fact that his principals might have to pay the money back, and this could only mean that bankruptcy was so threatening that the payments might turn out to be preferential.   These inferences were obvious, and the jury were at liberty to find that a prudent business man should have drawn them, and should have made a further effort to discover the truth.   But Loomis made no inquiry, although the three men in his office could have told him exactly what the situation was. They knew that the bankrupt was practically at the end of its resources; that on the very next day the secretary was to meet some of the creditors to discuss a plan for liquidation; and that a bill in equity was either already prepared, or at all events was seriously contemplated, for the appointment by the New Jersey chancery of a receiver on the ground of insolvency, and that in this bill the president and the treasurer were to be parties plaintiff.   The bill had been decided upon unless the company should obtain immediate help, and this was known to be out of the question, for the stockholders had refused to furnish more capital, and a purchaser of the business was nowhere in sight.   (The bill was filed August 18.)   And if he had asked for confirmatory details about the assets listed in the statement, he might have learned the facts that the $10,000 item of accounts receivable comprised many accounts of long standing, such as no business man of experience would accept as worth more than a small fraction of their face value, and that the item of fixtures and equipment valued them at cost, without charging anything off for depreciation, although no such valuation could possibly be correct.

But, even without inquiry of this sort, the circumstances were such as to point to only one conclusion, namely, that the company's situation was desperate, that in all probability insolvency already existed, and that, while he might be able to force an immediate settlement by the scarcely veiled threat of a criminal prosecution, he would force it at the risk of having the payment set aside as preferential.   These inferences were plainly suggested by the facts he knew, and, if he did not actually draw them, the jury had a right to say that a reasonable business man should have drawn them, or must take the consequence of failing so to do.   The trial judge was right in submitting this question to the jury, and as the charge was clear and adequate the verdict is conclusive.

The other questions raised by the assignments of error are of minor importance, and the rulings complained of do not furnish sufficient ground for reversal.

In each case the judgment is affirmed.